IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ERIK LEE PIERCE,

                            Plaintiff,                                   CV-06-1715-ST

        v.                                              FINDINGS AND
                                                          RECOMMENDATIONS

CITY OF SALEM d/b/a WILLAMETTE
VALLEY COMMUNICATIONS CENTER,
MARION COUNTY, GRANT ZAITZ and
JEFFREY GOODMAN,

                             Defendants.

STEWART, Magistrate Judge:

## <u>INTRODUCTION</u>

       Plaintiff, Erik Pierce ("Pierce"), who is deaf, filed this action against defendants City of

Salem and Marion County arising out of an altercation with two officers of the Keizer Police

Department, resulting in convictions for resisting arrest and assaulting a police officer.  Against

the City of Salem, Pierce alleges one claim for common law negligence.  Against Marion

County, he alleges claims for common law negligence and disability discrimination in violation

of Title II of the Americans with Disabilities Act ("ADA"), 42 USC §§ 12131-65, § 504 of the

Rehabilitation Act ("§ 504"), 29 USC § 794, and ORS 659A.142.  Pierce later amended his

complaint by adding a claim pursuant to 42 USC § 1983 against the two police officers, Grant

Zaitz ("Officer Zaitz") and Jeffery Goodman ("Officer Goodman"), alleging that they violated

his Fourth Amendment right to be free from unreasonable seizures by using unreasonable force

in effecting his arrest.  This court has jurisdiction over Pierce's federal claims under 28 USC

§§ 1331 and 1334 and supplemental jurisdiction over the state law claims pursuant to 28 USC

§ 1367(a).

Officers Zaitz and Goodman have filed a motion for summary judgment against Pierce's

§ 1983 claim (docket #34), and Pierce has filed a motion for partial summary judgment against

Marion County on his claims for disability discrimination pursuant to the ADA and § 504

(docket #40).  For the reasons that follow, both motions should be denied.

## STANDARDS

FRCP 56(c) authorizes summary judgment if "no genuine issue" exists regarding any

material fact and "the moving party is entitled to judgment as a matter of law."  The moving

party must show an absence of an issue of material fact.  *Celotex Corp. v. Catrett*, 477 US 317,

323 (1986).  Once the moving party does so, the nonmoving party must "go beyond the

pleadings" and designate specific facts showing a "genuine issue for trial."  *Id* at 324, citing

FRCP 56(e).  The court must "not weigh the evidence or determine the truth of the matter, but

only [determine] whether there is a genuine issue for trial."  *Balint v. Carson City, Nev.*, 180 F3d

1047, 1054 (9th Cir 1999) (citation omitted).  A "'*scintilla* of evidence,' or evidence that is

'merely colorable' or 'not significantly probative,'" does not present a genuine issue of material

2 - FINDINGS AND RECOMMENDATIONS

fact.  *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F2d 1539, 1542 (9th Cir), *cert denied*, 493 US 809 (1989) (emphasis in original) (citation omitted).

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F2d 626, 630 (9th Cir 1987).  The court must view the inferences drawn from the facts "in the light most favorable to the nonmoving party."  *Id* (citation omitted).

## FINDINGS

### I.    Officers' Motion for Summary Judgment

The Second Claim alleges that Officer Zaitz violated Pierce's Fourth Amendment right to be free from unreasonable seizures by attempting a physical take-down of him suddenly and without warning, provocation or lawful justification.[1]  It also alleges a  Fourth Amendment violation against Officer Goodman for authorizing and directing that a taser be used on him multiple times, thereby misusuing the taser as a pain compliance device.[2]  Both officers seek summary judgment against those allegations.

#### A.    Undisputed Facts

With respect to the summary judgment motion by Officers Zaitz and Goodman concerning their encounter with Pierce, this court assumes the facts in favor of Pierce.

Pierce is deaf and his primary language is ASL.  Pierce Decl., ¶ 1.  ASL is "a language completely separate from English.  It contains all the fundamental features a language needs to

---

[1]  Pierce also alleged, but has now withdrawn, a Fourth Amendment violation based on Officer Zaitz subsequently striking Pierce's face with his fist.

[2]  Pierce also alleged, but has now withdrawn, a Fourth Amendment violation based on Officer Goodman forcibly dislocating Pierce's right shoulder prior to directing the use of a taser.

function on its own – it has its own rules for grammar, punctuation, and sentence order."
Steinman Aff., Ex. 20.  Pierce cannot speak and does minimal lip reading.  Pierce Decl., ¶ 1;
Pierce Depo. Vol II, p. 13.  To communicate with someone who does not know ASL, he can
respond with gestures to simple written questions and write simple notes.  Pierce Decl., ¶ 1;
Pierce Depo. Vol. I, pp. 41-42.  However, his English and reading comprehension is at a third-
grade level, making it difficult for him to comprehend written English, in particular documents
covering complex subjects.  Pierce Decl., ¶ 1.

On December 25, 2005, Pierce was at his aunt's house in North Keizer.  Around 7:00
p.m., he argued with his sister and, after tripping and losing his balance, grabbed at and pushed
her and left the house on foot.  Pierce Depo. Vol. I, pp. 14-17; Pierce Depo. Vol. II, pp. 23-24.
At 7:13 p.m., a relative called 911 and reported that Pierce had been in a physical altercation
with his sister, had taken his sister's car keys, had left the house on foot and was believed to be
walking to the location of his sister's parked car.  Amended Complaint, ¶ 3.6.  The caller also
reported that Pierce was "hearing impaired and ha[d] some mental health issues."  *Id.*
Willamette Valley Communication Center's dispatch operator dispatched the Keizer police to
respond, stating:

> Just [occurred].  C[aller] states adult nephew just tried to hit his niece . . .
> Male is now on foot . . . [Southbound]  on River from Juedes.  Male
> Subj[ect] has the female's car keys . . . C[aller] believes subj[ect] is
> enroute to 2615 Claxter  . . . Sister's veh[icle] is at loc[ation]. . . C[aller]
> believes subj[ect] will take veh[icle] . . . Subj[ect]/Pierce, Erik, WMA, 34,
> 507, 225, d[ar]k curly hair, navy blu[e] hooded jacket, blu[e] jeans.

Park Decl., Ex. I, p. 3.

Unfortunately the dispatch operator did not report that Pierce was hearing impaired or had mental health issues.

At approximately 7:16 p.m., Officer Zaitz observed Pierce walking southbound on River Road toward a 7-Eleven convenience store. Zaitz Depo., pp. 33-34. He drove past Pierce without activating his overhead flashing lights, pulled into the 7-Eleven parking lot and got out of his car to stop Pierce, verify his identity and speak with him. *Id* at 41. On seeing Officer Zaitz, Pierce stopped, turned and walked northbound. Pierce Depo. Vol. I, pp. 18; Pierce Depo. Vol. II, pp. 7-8. Pierce assumed that Officer Zaitz was attempting to communicate with him because someone at his aunt's house had reported him to the police, but he wanted to be alone to cool off. Pierce Depo., Vol. II, pp. 8-9.

Officer Zaitz yelled at him to stop and, as he ran after Pierce, pulled out his taser and pointed it at him. Zaitz Depo., pp. 44-45. He also radioed that Pierce was "taking off" on him. Defferding Aff., Ex. 5 ("Criminal Trial Tr."), p. 57; Zaitz Depo., p. 40. Within a few seconds of hearing that radio announcement, Officer Goodman, an acting supervisor who was nearby, activated his lights, siren and dash-mounted video camera. Criminal Trial Tr., pp. 57-58. Seeing the approaching police car, Pierce stopped and turned back towards Officer Zaitz. Pierce Depo. Vol. I, pp. 19-20; Pierce Depo. Vol. II., p. 11. Pierce saw that Officer Zaitz was yelling, appeared to be angry and was pointing what appeared to be a gun (a taser) at him. Pierce Depo. Vol. I, pp. 20, 50-51. He raised his hands.[3] *Id* at 19; Zaitz Depo., p. 46. Officer Zaitz holstered

---

[3] Officer Zaitz states that Pierce immediately lowered his hands which Pierce denies. Zaitz Depo., p. 46.

his taser and, in order to detain Pierce for investigation, yelled at Pierce to get on the ground.[4]
Zaitz Depo., pp. 47-49; Criminal Trial Tr., pp. 36, 38.  Pierce did not move until Officer Zaitz
grabbed him.  Pierce Depo. Vol. I, p. 19; Pierce Depo. Vol. II, p. 13.

       The opening scene of the video from Officer Goodman's car, which began recording 38
seconds after Officer Zaitz stopped his car in the parking lot, depicts two persons in the distance
standing on the sidewalk, one of whom appears to have both arms outstretched pointing a gun at
the other.  Park Decl., Ex. A.  As Officer Goodman pulled into the parking lot, the right side of
the video shows Officer Zaitz facing the camera and returning his taser to its holster,
immediately after which he approached and grabbed Pierce and threw him to the ground.  *Id.*  At
the moment Officer Zaitz grabbed Pierce, he admits that Pierce "was just standing there," (Zaitz
Depo.,      pp. 50-51), but then felt Pierce tense up and begin to pull away.  Criminal Trial Tr., p.
36.  Officer Zaitz's take-down of Pierce occurred 12 seconds after the video recording began and
50 seconds into Officer Zaitz's encounter with Pierce.  Park Decl., Ex. A.  Officer Zaitz did not
want to wait for Officer Goodman's assistance because he did not know what Pierce planned to
do and wanted to resolve the situation or make it safe as quickly as possible.  Zaitz Depo., p. 53.

       Pierce landed on his hands and knees and immediately began to struggle and wrestle with
Officer Zaitz.  Criminal Trial Tr., p. 36.  He grabbed Officer Zaitz around the waist and pushed
him into the street toward oncoming traffic.  *Id*; Pierce Depo. Vol. II, pp. 13-14.  Officer
Goodman then joined the struggle to assist Officer Zaitz.  Criminal Trial Tr., p. 38.  Officer Zaitz
broke free of Pierce's grasp, spun behind him in order to take him down again to handcuff him,
and wrapped his right arm around his collar when Pierce intentionally bit Officer Zaitz's finger.

---

[4] Officer Zaitz states that he also simultaneously pointed at the ground, but Pierce denies seeing any such gestures.

6 - FINDINGS AND RECOMMENDATIONS

*Id*.  Officer Goodman forced Pierce to the ground again.  Goodman Depo., p. 37.  Because of

continued resistance, Officer Zaitz struck Pierce in the face.  *Id*.  Because Officer Goodman felt

that he could not control Pierce, he Goodman told Officer Zaitz to use his taser.  Goodman

Depo., pp. 39-40.  Both officers separated and stepped back from Pierce.  Zaitz Depo., p. 64;

Park Decl., Ex. A.  While lying on his back on the ground, Pierce raised his hands in a sign of

surrender (the peace sign) and cried out in either pain or fear.  Park Decl., Ex. A; Pierce Depo.

Vol II, p. 17.  Officer Zaitz then knelt down close to Pierce's left shoulder and deployed his

taser.  Pierce Depo. Vol. II, p. 17; Zaitz Depo., p. 64; Goodman Depo., p. 40; Criminal Trial Tr.,

p. 39.  Officer Fletcher, who had just arrived on the scene, simultaneously deployed his taser

four times, for a total of 23 seconds over a 31 second interval.  Fletcher Depo., p. 26.  On the

video, Pierce was yelling in pain or fright.  Park Decl., Ex. A.  As the tasers were deployed,

Officer Goodman told Pierce to get "on your belly."  *Id*.  When other officers arrived, Officer

Zaitz disengaged and called medics to the scene.

   The elapsed time shown on the video from its inception to the request for Code 3 Medics

is one minute and 15 seconds.  *Id*.  At that point, the struggle was over and Pierce was in

custody.       Immediately after the struggle, Pierce's aunt arrived.  Pierce Depo. Vol. II, p. 27.

Pierce signed to her as best he could with his hands handcuffed behind him that his shoulder was

injured.  *Id* at 28.  It is unclear when or how his shoulder was injured, although it began to hurt

Pierce when he was handcuffed.  *Id* at 15-16.  The officers then took Pierce directly to the

hospital where he was treated for a dislocated shoulder.  *Id* at 27.  Officer Zaitz also was treated

at the hospital for the bite injury to his finger.  Criminal Trial Tr., pp. 40-41.  Pierce was then

taken and lodged in the Marion County jail.

7 - FINDINGS AND RECOMMENDATIONS

Pierce was charged by an Information with Assaulting a Police Officer (class C felony), Resisting Arrest (class A misdemeanor), and Harassment (class B misdemeanor).  Park Decl., Ex. H, p.1   The Harassment charge was dismissed before trial.  A jury found Pierce guilty of Assaulting a Police Officer and Resisting Arrest.  *Id* at 2.

**B.    *Heck* Doctrine**

Officers Zaitz and Goodman first assert that Pierce's convictions for Resisting Arrest  and Assaulting a Police Officer preclude him from prevailing on a § 1983 claim for the use of excessive force.  This assertion is based on *Heck v. Humphrey*, 512 US 477 (1994), which held that:

> [I]n order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.  A claim for damages bearing that relationship to a conviction or sentence that has not been so invalidated is not cognizable under § 1983.  Thus, when a state prisoner seeks damages in a § 1983 suit, the district court *must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence*; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.  But if the district court determines that the plaintiff's action, even if successful, will not demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

*Id* at 486-87 (footnotes omitted) (emphasis added).

In two relevant cases, the Ninth Circuit has addressed the application of *Heck* to a § 1983 claim for the use of excessive force.  First, *Sanford v. Motts*, 258 F3d 1117 (2001), involved a

claim of excessive force where a police officer punched the plaintiff after she was handcuffed. She later pled no contest to resisting, obstructing and delaying a police officer in violation of California Penal Code § 148(a)(1).  The court held that *Heck* did not bar the plaintiff's § 1983 action because nothing in the record identified the factual basis for the plaintiff's no contest plea and the punch was not an arrest.  While California law requires that an officer be acting lawfully in the performance of his duties when being resisted, obstructed, or delayed, "[e]xcessive force used after an arrest is made does not destroy the lawfulness of the arrest."  *Id* at 1120, citing *In re Joseph F.*, 85 Cal App 4th 975, 102 Cal Rptr2d 641 (2000).  "Hence, if [the officer] used excessive force subsequent to the time [the plaintiff] interfered with his duty, success in her section 1983 claim will not invalidate her conviction."  *Id*; *accord*, *Smithart v. Towery*, 79 F3d 951, 952-53 (9th Cir 1996) (*Heck* did not bar excessive force claim where plaintiff pled no contest to assault with a deadly weapon and challenged not the validity but manner of his arrest).

Based on a conviction under the same California statute as in *Sanford*, the defendants in *Smith v. City of Hemet,* 394 F3d 689 (9th Cir) (*en banc*), *cert denied*, 545 US 1128 (2005), argued that *Heck* barred Smith's § 1983 claim for excessive force.  As in *Sanford,* the court noted that under California law, the lawfulness of the officer's conduct is an essential element of the offense of resisting, delaying, or obstructing a peace officer.  Therefore, a conviction under this statue necessarily meant that the officer did not use excessive force in effecting the arrest.  If Smith proved that the officers used excessive force during his arrest, he would unequivocally imply the invalidity of his conviction.  However, under California law, "the time of arrest" only includes that time period when the arrest is being effected and not the time period before or after.  The court identified two separate phases of Smith's resistance to the officers, initially while the

officers were performing their investigation by refusing to comply with their commands and then during their attempt to arrest him.  As a result, it held that *Heck* would bar Smith's §1983 claim based on the officers' use of force to effect his arrest, but not based on the officers' conduct before or after his arrest.  Smith had pled no contest to the criminal charge without stipulating as to what conduct constituted the basis for his conviction.  Because it was impossible for the court to determine which period of conduct resulted in his criminal conviction, the *Heck* bar did not apply.

Two conclusions may be derived from *Smith* and *Sanford*.  First, *Heck* does not bar a §1983 claim for excessive force occurring before or after the conduct serving as the basis of the conviction because success would not cast a shadow on the validity of the underlying conviction.  Second, where the circumstances surrounding the plaintiff's conviction do not permit the court to conclude which of many acts formed the basis of the conviction, as in the case of a guilty or no contest plea, the court also is unable to conclude that a successful § 1983 claim would invalidate the earlier conviction.

It also is arguable that where the lawfulness of the officers' conduct is not an essential element of the crime, a convicted plaintiff may bring an excessive force claim.  For example, *Nelson v. Jashurek*, 109 F3d 142, 145-46 (3rd Cir 1997), applying Pennsylvania law, held that *Heck* did not bar an excessive force claim brought by a plaintiff who had been convicted of resisting arrest.  In order to find the plaintiff guilty of the crime of resisting arrest in Pennsylvania, the jury had to find that the officer was justified in using "substantial force" to overcome the plaintiff's resistance.  Even so, the Third Circuit held that the plaintiff's successful § 1983 claim would not call his underlying criminal conviction into question because "the fact

that [the officer] was justified in using 'substantial force' to arrest [the plaintiff] does not mean that he was justified in using an excessive amount of force and thus does not mean that his actions in effectuating the arrest necessarily were objectively reasonable." *Id* at 145. The court concluded that "there undoubtedly could be 'substantial force' which is objectively reasonable and 'substantial force' which is excessive and unreasonable." The court agreed with the Southern District of Mississippi that "'it is possible for a finding that [the defendant] was resisting arrest to coexist with a finding that the police used excessive force to subdue him.'" *Id* at 146, quoting *Simpson v. City of Pickens*, 887 F Supp 126 (SD Miss 1995) (brackets in original).

In contrast, *Hudson v. Hughes*, 98 F3d 868 (5th Cir 1996), held that *Heck* barred an excessive force claim by a plaintiff convicted of battery of a police officer. It explained:

> Because self-defense is a justification defense to the crime of battery of an officer, [the plaintiff's claim that officers] used excessive force while apprehending him, if proved, necessarily would imply the invalidity of his arrest and conviction for battery of an officer. This is true because the question whether the police applied reasonable force in arresting him depends in part on the degree of his resistance, which in turn will place in issue whether his resistance (the basis of his conviction for assaulting a police officer) was justified, which, if it were, necessarily undermines that conviction.

*Id* at 873.

Here Pierce was convicted of violating ORS 162.315(1) which provides that "[a] person commits the crime of resisting arrest if the person intentionally resists a person known by the person to be a peace officer or parole and probation officer in making an arrest." "Resists" is defined by ORS 162.315(2) as "the use or threatened use of violence, physical force or any other means that creates a substantial risk of physical injury to any person and includes, but is not limited to, behavior clearly intended to prevent being taken into custody by overcoming the

11 - FINDINGS AND RECOMMENDATIONS

actions of the arresting officer. The behavior does not have to result in actual physical injury to an

officer."

Unlike the California law at issue in *Sanford* and *Smith*, Oregon law does not expressly

provide that the use of excessive force by the officer at the time of the arrest negates the crime of

resisting arrest. Instead, ORS 161.235 restricts the use of force to the extent the officer

"reasonably believes it necessary" to make an arrest. If the officer uses excessive force, then the

defendant may use physical force as reasonably necessary under the circumstances to defend

himself and may raise "self-defense" as a defense to a charge of resisting arrest. *State v. Wright*,

310 Or 430, 435-36, 799 P2d 642, 645 (1990); ORS 161.205(5) & 161.209. Once raised, the state

has the burden of disproving that the defendant acted in self-defense beyond a reasonable doubt.

ORS 161.055(1); *State v. Freeman*, 109 Or App 472, 475, 820 P2d 37, 39 (1991). Because Pierce

failed to raise self-defense at his trial, the question of whether the officer's force was reasonable

was never put squarely before the jury.[5]

To avoid any difficulty with the *Heck* bar, Pierce seeks to avoid premising his excessive

force claim on the officers' conduct in effecting his arrest and instead relies on the *Smith*

exception to *Heck*. According to Pierce, his claim against Officer Zaitz arises out of conduct

*before* Pierce engaged in any of the conduct resulting in his convictions, and his claim against

Officer Goodman arises out of conduct *after* Pierce ceased all conduct which formed the basis for

---

[5] The issue of whether a failure to raise self-defense to the charge of resisting arrest should or should not bar an
excessive force is not raised by the parties and thus need not be resolved. *See Mitchell v. Demski*, 2007 WL 2023471, *4-5 (July
11, 2007) (holding that *Heck* barred plaintiff's excessive force by concluding that under Arizona law (which is very similar to
Oregon law) "[a] defendant can only be convicted of resisting arrest . . . if the officer's conduct was 'lawful' when effecting the
arrest; an officer's conduct was not 'lawful' if he used excessive force.") (citations omitted).

his convictions.  He points out that the jury's general verdict does not indicate which of several possible acts, together or separately, formed the basis for his conviction for Resisting Arrest.

Defendants distinguish Pierce's situation from *Smith* in two respects.  First, they contend that Pierce's conviction stems from one course of uninterrupted conduct that lasted less than two minutes, all of which constituted resisting arrest.  Under Oregon's merger statute, ORS 161.067(3), a defendant may be charged and convicted only once for repeated violations of the same statute during a single incident against the same victim "without a sufficient pause in the defendant's criminal conduct to afford the defendant an opportunity to renounce the criminal intent."  In order to take advantage of this merger statute, all of the officers' conduct must relate to the arrest.  However, as explained next, this case involves potentially three different phases:  an investigative stop, an arrest, and post-arrest conduct.

Under Oregon law, an officer "who reasonably suspects that a person has committed or is about to commit a crime may stop the person and, after informing the person that the peace officer is a peace officer, make a reasonable inquiry."  ORS 131.615(1).  The "detention and inquiry" are limited to "the vicinity of the stop and for no longer than a reasonable time."  ORS 131.615(2).  A reasonable inquiry is limited to:

> (a)  The immediate circumstances that aroused the officer's suspicion;
> (b)  Other circumstances arising during the course of the detention and inquiry that give rise to a reasonable suspicion of criminal activity; and
> (c)  Ensuring the safety of the officer, the person stopped or other persons present, including an inquiry regarding the presence of weapons.

ORS 131.615(3).

Officer Zaitz initially stopped Pierce in order to investigate the 911 report and a suspicion of criminal activity, namely Pierce's reported intention of taking his sister's car. Of course, the fact that Pierce was convicted of resisting arrest establishes that at some point the stop turned into an arrest. However, it is disputed how and when that happened.

Officer Zaitz contends that he had probable cause to arrest Pierce after he refused to get on the ground as directed, if not when he first saw Pierce due to the dispatch report that Pierce "tried to hit his niece" and was heading for his sister's car. Pierce maintains that Officer Zaitz had no basis to arrest him before the initial take-down. All Pierce had done at that point was take his sister's car keys when he left his aunt's house. Although the criminal information initially charged Pierce with Harassment, Officer Zaitz knew only that Pierce had "tried to hit his niece" without any information as to the circumstances. Officer Zaitz himself states that until Pierce resisted the take-down, he only intended to stop and question Pierce, not arrest him. Therefore, it is a reasonable inference that prior to the take-down, Officer Zaitz had only performed the more limited intrusion of stopping Pierce.

The fact that Officer Zaitz used force (drawing his taser) during his detention and inquiry of Pierce does not turn the stop into an arrest. Under Oregon law, an officer "may use the degree of force reasonably necessary to make the stop and ensure the safety of the peace officer . . . ." ORS 131.615(5). Since Officer Zaitz put away his taser before throwing Pierce on the ground, it is reasonable to infer that Pierce posed no continuing threat to Officer Zaitz's safety.

Officer Zaitz contends he attempted the take-down because Pierce was noncompliant with his instructions and gestures. However, Pierce states that he did nothing to resist other than not responding to verbal commands which he could not understand. Not knowing Pierce was deaf,

14 - FINDINGS AND RECOMMENDATIONS

Officer Zaitz potentially had probable cause at that point to arrest Pierce for interfering with a peace officer. The crime of Interfering with a Peace Officer is committed "if the person, knowing that another person is a peace officer . . . [r]efuses to obey a lawful order by the peace officer . . . ." ORS 162.247(1)(b). However, Pierce was neither charged with nor convicted of that crime, rendering the *Heck* bar inapplicable to that conduct. *See Sjogren v. City of Seaside*, 2007 WL 221869, *8 (D Or Jan. 19, 2007) (holding that a conviction for Interfering with a Peace Officer bars an excessive force claim premised on conduct prior to the plaintiff actively resisting arrest.). Instead, Pierce was charged and convicted for Assaulting a Police Officer and Resisting Arrest. Given that Pierce only passively resisted until Officer Zaitz attempted the take-down, Officer Zaitz could not have attempted the take-down with an intent to arrest him for resisting arrest. Thus, Pierce's conviction for Resisting Arrest could not have been based on his inability to hear and comply with Officer Zaitz's commands during the stop. ORS 162.315(2)(c).

The existence of an investigate stop distinguishes this case from *Mitchell*, 2007 WL 2023471. In *Mitchell,* the plaintiff's conviction for resisting arrest barred his § 1983 claims for excessive force because the entire incident was a single course of events. In that case, the plaintiff, suffering from drug-induced hallucinations, screamed repeatedly and stripped off his clothes in a convenience store parking lot. The officers responded to a call from the convenience store clerk that the plaintiff was trespassing and told the plaintiff to dress and leave. A struggle ensued when the plaintiff refused and resisted their escort. The plaintiff did not dispute that the officers had probable cause to arrest him for trespassing and that they did not use force until after he continued to disobey their verbal commands. Noting that the use of force did not occur in

15 - FINDINGS AND RECOMMENDATIONS

different phases as in *Smith*, the court barred the plaintiff's claim under *Heck*.  In contrast, it is disputed here whether Officer Zaitz had an probable cause to arrest Pierce prior to the takedown.

Officer Zaitz clearly had probable cause to arrest Pierce after being assaulted during the struggle on the ground.  However, by not pursuing an excessive force claim for any acts by Officer Zaitz after the attempted take-down, Pierce has placed himself squarely within the *Smith* exception to *Heck* for excessive force used by Officer Zaitz prior to the arrest.

Whether the alleged excessive force used by Officer Goodman was during or after the arrest similarly is a disputed issue.  Officer Goodman claims that he directed the use of tasers because Pierce was resisting arrest.  Pierce responds that Officer Goodman directed the use of tasers only after he was compliant on the ground, such that its use was strictly punitive.  On this record, it is not clear when Pierce ceased resisting arrest.

Second, defendants contend that Pierce did not plead guilty or no contest, but was tried and convicted by a jury for the single act of resisting arrest.  As support, they rely on the following footnote in *Smith*:

> Where a defendant is charged with a single-act offense but there are multiple acts involved each of which could serve as the basis for a conviction, a jury does not determine which specific act or acts form the basis for the conviction.  Thus, a jury's verdict necessarily determines the lawfulness of the officers' actions throughout the whole course of the defendant's conduct, and any action alleging the use of excessive force would "*necessarily* imply the invalidity of his conviction."  However, where a § 1983 plaintiff has pled guilty or entered a plea of nolo contendere,  it is *not* necessarily the case that the factual basis for his conviction included the whole course of his conduct. In the case of a guilty plea or plea of nolo contendere, a defendant is free to admit having committed a specific act or acts of resistance, delay, or obstruction, to identify the particular acts of unlawfulness to which he is willing to plead, and to deny that he engaged in other specific acts.

*Smith*, 394 F3d at 699, n5 (internal quotations and citations omitted, emphasis in original).

Unlike the plaintiff in *Smith*, Pierce was tried and convicted by a jury. However, the distinction between a plea and a jury trial was not critical in *Ashley v. Sutton*, 492 F Supp2d 1230 (D Or 2007), which declined to invoke the *Heck* bar with respect to convictions after a jury trial. It noted that several events, "together or separately, could have constituted the basis for Ashley's conviction for resisting arrest" and that with respect to the disorderly conduct conviction, "the jury made no special findings and the trial was not recorded." *Id* at 1255. As defendants correctly note, *Ashley* did not discuss the point made by the footnote in *Smith*, but *Smith* only made that point in *dicta* as one of three reasons to distinguish a California case relied on by the dissent. A plea of guilty or nolo contendre certainly provides an additional basis to find that a successful § 1983 claim would not invalidate a prior conviction. Nothing a jury trial does not *ipso facto* preclude that same conclusion. Instead, that determination depends on the clarity of the record.

Here the record underlying Pierce's conviction by a jury is more complete than in *Ashley*. The parties have submitted portion of the trial transcript (the testimony of Officers Zaitz and Goodman) and the video received in evidence at trial. Nevertheless, the jury did not render a special verdict. A review of the trial materials supporting Pierce's conviction demonstrates the existence of a material issue of fact as to whether the tasing extended beyond the point at which Pierce had surrendered to the police. The video show Pierce lying on his back with his hands in the air, making motions with his hands which he asserts is the peace sign, a sign of surrender. The video also shows the taser being applied for some period after that. A jury viewing this evidence could conclude that the officer's use of force extended past the point at which his arrest

effectively concluded, taking it outside the ambit of *Heck*.  Based on the record and disputed facts as to when the investigative stop ended and the arrest began and when Pierce's resistance ended, this court is unable to conclude as a matter of law that Pierce's success on the excessive force claim would necessarily invalidate his conviction for resisting arrest.

### C.    Qualified Immunity

#### 1.    Legal Standards

The doctrine of qualified immunity protects, "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Harlow*, 457 US 800, 818 (1982) (citation omitted).  Therefore, public officials are generally immune from civil liability unless their actions violate clearly established law because "a reasonably competent public official should know the law governing his conduct."  *Id* at 819.  "The qualified immunity standard gives ample room for mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the law."  *Hunter v. Bryant*, 502 US 224, 229 (1991) (citation and internal quotations omitted).

The Supreme Court has established a two-part analysis for determining whether qualified immunity is appropriate in a suit against an officer for an alleged violation of a constitutional right.  *Saucier v. Katz*, 533 US 194, 201 (2001).  The court first determines whether the officer violated the plaintiff's constitutional rights on the facts alleged and, if so, then determines whether the constitutional rights were clearly established.  *Id*.

#### 2.    Constitutional Violation

Whether an officer has used excessive force in effecting an arrest is determined by assessing whether the force applied was objectively reasonable "in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." *Graham v. Connor*, 490 US 386, 397 (1989). Determining the reasonableness of the force "requires a careful balancing of the nature and quality of the intrusion on an individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id* at 396 (internal quotation marks and citations omitted). This analysis requires consideration of the following factors: (1) the severity of the crime at issue; (2) whether the suspect posed an immediate threat to the safety of the officers or others; and (3) whether the suspect actively resisted arrest. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F3d 912, 921 (9th Cir 2001). Given that the balancing usually involves disputed factual contentions, summary judgment in excessive force cases "should be granted sparingly." *Drummond v. City of Anaheim*, 343 F3d 1052, 1056 (9th Cir 2003), *cert denied*, 542 US 918 (2004).

### a.    Officer Zaitz

Officer Zaitz did not know Pierce was deaf and was unable to hear his commands to stop. After seeing Officer Goodman approach, Pierce faced Officer Zaitz and raised his hands. Officer Zaitz then holstered his taser. At that point, viewing the facts in the light most favorable to Pierce, his hands remained in the air and Officer Zaitz did not point to the ground or give him insufficient time to comply with any commands. The governmental interests in the use of force were minimal. The suspected crime was not severe. Pierce did not threaten violence towards Officer Zaitz and gave no reason to believe that he was armed and dangerous. Instead Officer Zaitz could have waited a few more seconds until Officer Goodman had left his car and reached

the area where he and Pierce were standing.  With two officers present, they could have frisked

Pierce and, upon calmly questioning him further, determined that he was deaf when Pierce

responded by signing to them.

Thus, even if Officer Zaitz properly sought to detain Pierce, a reasonable fact-finder could

conclude that he violated the Fourth Amendment by acting too quickly to forcibly throw Pierce

on the ground and using force without provocation.

> **b.**    **Officer Goodman**

Again, assuming the facts in Pierce's favor, Officer Goodman called for the use of tasers

after Pierce was on his back and surrendered by putting his hands in the air.  Although Officer

Goodman did not use the taser himself, he participated in and asserted direction and control over

other officers to use the taser.  This is sufficient "integral participation" to render him personally

liable for the other officers' conduct.  *Jones v. Williams*, 297 F3d 930, 935 (9th Cir 2002); *also see*

*Boyd v. Benton County*, 374 F3d 773, 780 (9th Cir 2004) (each SWAT officer who entered

plaintiff's home could be liable for excessive force as a participant, even though only one of them

deployed the flash bang grenade).

Officer Goodman contends that tasers were needed as a tactic, similar to a control hold, to

handcuff Pierce who was violent and aggressive and would not stop fighting.  He asserts that only

after application of the tasers did Pierce comply and allowed himself to be handcuffed.  The use

of force to subdue suspects has been held to be objectively reasonable, even where it resulted in

serious physical injury.  *See Miller v. Clark County*, 340 F3d 959, 968 (9th Cir 2003) (use of

police dog to bite and hold fleeing plaintiff was not excessive force under the circumstances);

*Jackson v. City of Bremerton*, 268 F3d 646, 652-53 (9th Cir 2001) (spraying plaintiff's hair with a

chemical irritant prior to her arrest, pushing her to the ground to handcuff her, and then pulling

her roughly to her feet was not excessive force); *Eberle v. City of Anaheim*, 901 F2d 814, 819-20

(9th Cir 1990) (finger hold to control a belligerent football fan was objectively reasonable).

However, viewing the facts most favorably to Pierce, a reasonable fact-finder could

conclude that Pierce surrendered and that further use of force by any officer was unnecessary.

Force which is gratuitous or applied after the need for any force has dissipated is constitutionally

unreasonable.  For example, in *Drummond*, the officer's act of continuing to press his weight on

the detainee's neck and torso as he lay handcuffed on the ground and begged for air was an

unreasonable use of force.  343 F3d at 1059.  Similarly in *LaLond v. County of Riverside*, 204 F3d

947 (9th Cir 2000), it was unreasonable force to fail to loosen handcuffs and wipe pepper spray

from the suspect's face after he complained of pain.  The court explained that:

> the use of such weapons (*e.g.*, pepper sprays; police dogs) may be
> reasonable as a general policy to bring an arrestee under control, but in a
> situation in which an arrestee surrenders and is rendered helpless, any
> reasonable officer would know that a continued use of the weapon or a
> refusal without cause to alleviate its harmful effects constitutes excessive
> force.

*Id* at 960.

According to the taser training materials, officers should move in and control the subject

while the taser is cycling and the subject is incapacitated.  Park Decl., Ex. K-6.  Each cycle should

be used be used as a "window of opportunity" to attempt to establish control over the subject and

multiple cycles can be avoided by controlling/cuffing under power if contact officers are

available.  *Id*.  Officer Goodman, as the supervisor on the scene, not only directed the use of

tasers, but also did not direct one of the other officers present to move up and handcuff Pierce or

direct Officer Fletcher to cease tasing Pierce.  Under the circumstances, the repeated use of the

taser on Pierce could be an unreasonable use of force in which Officer Goodman participated.

### 3.    Law Clearly Established

"The relevant, dispositive inquiry in determining whether a right is clearly established is

whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he

confronted."  *Saucier*, 533 US at 202 (citation omitted).  And, "[i]f the law did not put the officer

on notice that his conduct would be clearly unlawful, summary judgment based on qualified

immunity is appropriate."  *Id* (citation omitted).  However, to be clearly established, the law need

not be a "precise formulation of the standard" where "various courts have agreed that certain

conduct is a constitutional violation under facts not distinguishable in a fair way from the facts

presented in the case at hand."  *Id*.  Therefore, the key inquiry in determining whether an officer

has qualified immunity is whether the officer has "fair warning" that his conduct was

unconstitutional.  *Hope v. Pelzer*, 536 US 730, 739-40 (2002).

The law is clearly established that it is constitutionally unreasonable to use force where

there is no need for force and to continue the application of force after the need for such force has

dissipated or to gratuitously to inflict pain.  *See, e.g., Drummond*, 343 F3d at 1059.  Given the

factual disputes, defendants cannot prove for the purpose of qualified immunity that a reasonable

officer could have believed that he did not violate these constitutional rights.

## II.    Pierce's Motion for Partial Summary Judgment

Pierce seeks partial summary judgment on his Fourth and Fifth Claims against Marion

County alleging violations of the ADA and § 504 of the Rehabilitation Act by denying him an

aid, benefit or service that was as equally effective as provided to non-hearing impaired

individuals and otherwise discriminating against him based on his disability during his incarceration.

A.    **<u>Undisputed Facts</u>**

With respect to Pierce's partial summary judgment motion concerning his incarceration, this court assumes the facts in favor of Marion County.

Piece was incarcerated at MCCF at 11:20 p.m. on December 25, 2005. Steinman Aff., Ex. 14. Deputy Scott DiNardo, who does not know ASL, took Pierce through the intake process. He asked Pierce to read the Intake Health Screening Form. DiNardo Depo., p. 42. He then completed the form by communicating with Pierce by note or standing next to him and turning the form so they could both see it and asking him to read the questions to which he wrote down the answers.[6] *Id* at 42-44. The form shows no notation of medications and one question ("other medical problems") has both "yes" and "no" circled with the added handwritten notation of "depression." Steinman Aff., Ex. 14.

A nurse, Darlene Young, also saw Pierce during intake. Pierce Decl., ¶ 3; Young Depo. pp. 57-59. She did not know ASL, but felt that she was able to communicate with Pierce.[7] Young Depo., pp. 59-60. Young concluded that Pierce had some injuries and was in pain of 7 to 8 on a scale of 10. *Id* at 57. She lodged him in C4, the medical unit, where his problems would be addressed the next day by the doctor. *Id* at 57-58.

---

[6] Pierce claims that he did not understand anything Deputy DiNardo said, was an emotional wreck, was very confused and did not understand critical portions of the form. Pierce Depo., pp. 78-79; Pierce Decl, ¶ 5.

[7] Pierce claims that the nurse just spoke to him and he did not understand anything she said. Pierce Decl., ¶ 3. Pierce could not tell anyone how much pain he was in, about his mental illness of schizophrenia, or that he needed to take medicine for his mental illness to avoid having hallucinations. *Id.*

Because Pierce had physically assaulted and seriously injured Officer Zaitz, he was placed in Administrative Segregation.[8]  Steinman Aff., Ex. 25; Dizotell Depo., pp. 109-112.  At that time, no one explained to Pierce his rights, asked if he needed protective custody or explained what it was.  Pierce Decl., ¶ 6.  He did not see the jail's orientation video, was not given an inmate handbook, and did not have the rules explained to him.  *Id* at ¶ 7.  No one told him that he was placed in Administrative Segregation which denied him certain privileges, such as using a telephone.  *Id* at ¶ 8.  No one told him he had the right to challenge this classification.  *Id.*

Pierce was kept in a holding cell his first night at the jail.  Pierce Decl., ¶ 4.  He did not have a blanket and was cold.[9]  *Id.*  He tried to ask for a blanket, but no one understood him.  *Id.*  Sometime after midnight, he had one communication with Deputy Christy Johnson who was making rounds and knew ASL.  Using gestures, Pierce asked what time the nurse would be coming, and she signed "in the night" when she thought she was signing "in the morning."  Johnson Depo., pp. 17-18, 37; Steinman Aff., Ex. 22 (ASL for "morning" and "night").  Pierce nodded his head in response and did not appear to be confused.  Johnson Depo., pp. 18, 24, 37.  Deputy Johnson does not recall Pierce asking her for a blanket.  *Id* at 19.

On the morning of December 26, 2005, nurse Linda Fiegi visited him.  Fiegi Depo., pp. 24-25.  The night nurse told Fiegi that Pierce was deaf, but could communicate by reading and writing notes and reading lips.  *Id* at 28-29.  Fiegi did not know ASL, but believes that Pierce was able to understand her by reading her lips and answering her written questions with head gestures

---

[8]  Unlike a regular inmate who can get out of the cell one to two times a day and use the telephone, inmates in Administrative Segregation can get out of the cell 20 minutes every third day to shower and clean the room.  Posten Depo. p. 32.

[9]  Usually inmates receive a standard issue of two blankets and sheets.  Herring Depo., p. 77.  Although it is not clear, Pierce could have been asking for another blanket.

for "yes" or "no." *Id* at 21-22, 29-30. Due to his right shoulder injury and swollen right eye, she ordered Ibuprofin and put him on the medical list for December 29, 2005. Steinman Aff., Ex. 14, p. 2.

Pierce wanted to call his family to get his medicine and wrote a note asking to use the TTY phone. Pierce Decl., ¶ 10. Realizing that talking and lip reading would not work, the shift supervisor, Deputy Judy Poston, wrote a note to Pierce that he would not be allowed to use the phone because he was placed on Administrative Segregation. Poston Depo., pp. 23-25. She also wrote that his behavior would determine whether he could get out of Administrative Segregation. *Id* at 26. Although Pierce states that he did not understand why his request was denied (Pierce Decl., ¶ 10), he did not appear confused to Poston. Poston Depo., pp. 28-29.

Pierce became very frustrated and angry because he could not communicate with anyone. Pierce Decl., ¶ 11. Even though he had paper and pencil in his cell, he started yelling and banging on the door to get someone to communicate with him. *Id*; Herring Depo., p. 78. As a result, he was strapped in a restraint chair for one and a half hours. Pierce Decl., ¶ 12. Although Piece claims that no one explained why, tried to calm him down, or tried to understand his frustration and anger (*id* at      ¶ 11), Deputy Jim Herring tried to calm him down by writing notes and putting the rule book in front of him to read which he "flipped off." Herring Depo., pp. 58, 63-64, 70-71, 74. With his hands strapped to the chair, Pierce could not use ASL and could not write notes. Pierce Decl., ¶ 11; Poston Depo., p. 62. However, based on Pierce reading the rule book, shaking his head "yes" and "no," and getting calmed down in less than 30 minutes, Deputy Herring believes that he effectively communicated with Pierce. Herring Depo., pp. 66-67,

70-72.  While in the restraint chair, no one asked Pierce if he wanted water or needed to go to the bathroom.  Pierce Decl., ¶ 11.

Later that day Pierce requested a blanket in his cell which was denied.  *Id* at ¶12.  When he became angry, he was strapped in the restraint chair a second time for almost four hours.  *Id*; Herring Depo., p. 86; Steinman Aff., Ex. 28.  During the first hour in the chair, he was so frustrated and angry that he yelled and made the chair jump around.  Pierce Decl., ¶ 12; Steinman Aff., Ex. 28.  For the next three hours, he calmed down and sat quietly.  *Id*.  He never asked for anything again because he wanted to avoid being put back in the restraint chair.  Pierce Decl., ¶ 12.

On the morning of December 27, 2005, Pierce was seen by Dr. Rexin who, through the exchange of notes, learned that Pierce had a self-reported history of depression and ADHD.  Lapham Decl., p. 4.  Another nurse presented him with medical release forms (*id* at 1-2), explaining them by writing notes.  Pierce did not fully understand the forms.  Pierce Decl., ¶ 9.  Because the release authorized MCCF to contact his health care provider, Piece received his medications, including Cymbalta (changed to Zoloft), Seroquel, and Ranitidine.  Lapham Decl. Ex.1, pp. 6-8.

When Pierce's aunt arrived at the jail on December 28, 2005, to pick up Pierce, she was told to come back two hours later.  Simmons Depo., pp. 47-48.  At that time, she requested an ASL interpreter for Pierce and was told that one would be present.  *Id*.  During the release process, MCCF staff goes over the release documents, ensuring that the inmate knows when he is due back in court, what conditions have been placed on his release, and whether he is prohibited contact with any other individuals.  Dizotell Depo., pp. 172, 175-76.  Prior to Pierce's release,

Deputy Jacob Ramsey started filling out some forms.  Pierce Decl., ¶ 13.  Pierce did not

understand anything that he said.  *Id*.  Because the deputy did not explain the terms and

conditions of his release, Pierce did not understand that he could not stay at home and had to stay

away from his sister and when he had to appear in court.  *Id*.  He understood nothing until his aunt

picked him up and used ASL to explain it to him.  *Id*.

Marion County did not provide a qualified ASL interpreter to Pierce during his

incarceration at the MCCF from December 25 through 28, 2005.  Pierce did not inform any

MCCF staff that he spoke ASL and did not request an ASL interpreter.

Before his 2005 arrest, Pierce had been in jail three time in other states.  Pierce Depo.

Vol. II, pp. 3-4.

     **B.**     **ADA and § 504 of the Rehabilitation Act**

          **1.**     **ADA**

Title II of the ADA, 42 USC § 12132, provides as follows:

> Subject to the provisions of this subchapter, no qualified individual with a
> disability shall, by reason of such disability, be excluded from participation
> in or be denied the benefits of the services, programs, or activities of a
> public entity, or be subjected to discrimination by any such entity**.**

The implementing regulations further require that:

> (b)(1) A public entity, in providing any aid, benefit or service, may not . . .
>                          * * *
> (ii)  Afford a qualified individual with a disability an opportunity to
> participate in or benefit from the aid, benefit, or service that is not equal to
> that afforded others;
> (iii)  Provide a qualified individual with a disability with an aid,
> benefit, or service that is not as effective in affording equal
> opportunity to obtain the same result, to gain the same benefit, or to
> reach the same level of achievement as that provided to others;
>                          * * *

> (b)(7)  A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program or activity.

28 CFR § 35.130(b)(1).[10]

To prove a violation of Title II of the ADA for disparate treatment, a plaintiff must show:

> (1) he is a "qualified individual with a disability"; (2) he was either excluded from participation in or denied the benefits of a public entity's services, programs or activities, or was otherwise discriminated against [3] by [a] public entity; and [4] such exclusion, denial of benefits, or discrimination was by reason of his disability.

*Weinreich v. Los Angeles County Metro. Transp. Auth.*, 114 F3d 976, 978 (9th Cir), *cert denied*,

522 US 971 (1997).

"Discrimination" under the Act includes more than just intentional or unintentional acts

that have the effect of excluding individuals with disabilities, but extends to entities

> not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity[.]

42 USC § 12112 (b)(5)(A).

Thus, courts have noted that:

> A disability discrimination claim may be brought either on the theory that defendant failed to make reasonable accommodations or on a more conventional disparate treatment theory, or both. This is because the ADA not only protects against disparate treatment, it also creates an affirmative

---

[10]  Title II expressly delegates rule-making authority to the Attorney General to promulgate regulations implementing 42 USC § 12132.  These regulations " should be given controlling weight unless they are 'arbitrary capricious, or manifestly contrary to the statute.'" *McGary v. City of Portland*, 386 F3d 1259, 1269 n6 (9th Cir 2004), quoting *Bay Area Addiction Research and Treatment, Inc. v. City of Antioch*, 179 F3d 725, 732 n11 (9th Cir 1999).

28 - FINDINGS AND RECOMMENDATIONS

> duty in some circumstances to provide special, preferred treatment, or
> "reasonable accommodation."

*Dunlap v. Ass'n of Bay Area Gov'ts*,  996 F Supp 962, 965 (ND Cal 1998).

Pierce's allegations support both an intentional discrimination and failure to accommodate claim.  Importantly, however, damages are not available under the ADA absent a showing of discriminatory intent.  *Ferguson v. City of Phoenix*, 157 F3d 668, 674 (9th Cir 1998), *cert denied*, 526 US 1159 (1999).

## 2.    § 504 of the Rehabilitation Act

Public entities operating programs or activities that receive federal financial assistance also are subject to § 504 of the Rehabilitation Act.  Similar to the ADA, § 504 provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ."  29 USC § 794(a).  To prove a violation of § 504, "a plaintiff must show: (1) he is an 'individual with a disability'; (2) he is 'otherwise qualified' to receive a benefit; (3) he was denied the benefits of the program *solely by reason of his disability*; and (4) the program receives federal financial assistance." *Weinreich*, 114 F3d at 978 (emphasis in original) (citations omitted).

Title II of the ADA was expressly modeled after § 504.  Thus, "[t]here is no significant difference in analysis of the rights and obligations created" by these statutes.  *Zukle v. Regents of Univ. of Cal.*, 166 F3d 1041, 1045 n11 (9th Cir 1999).  *See* 42 USC § 12133 ("The remedies, procedures, and rights set forth in [§ 504] shall be the remedies, procedures, and rights this

subchapter provides to any person alleging discrimination in violation of section 12132 of this title.").

        **3.**      <u>**Issues**</u>

       The parties agree that Pierce is a qualified individual with the disability of deafness who was qualified to participate in and benefit from Marion County's services, programs, or activities. They further agree that Marion County is a public entity covered by the ADA and § 504 and that it receives federal funds for the operation of the MCCF.  Thus, at issue here are the second and fourth elements of Pierce's claim, namely, whether he was denied the benefits of a program, service or activity, or was otherwise discriminated against, by reason of his disability.

        **4.**      <u>**Regulations Regarding Notice and Effective Communication**</u>

       In addition to the anti-discrimination provisions of ADA and § 504, both statues impose affirmative obligations on public entities for dealing with disabled persons.  Regulations implementing § 504 require that an entity receiving public funding

> provide appropriate auxiliary aids to qualified handicapped persons with impaired sensory, manual, or speaking skills where a refusal to make such provision would discriminatorily impair or exclude the participation of such persons . . . .  Such auxiliary aids may include brailled and taped material, qualified interpreters, readers, and telephonic devices. Attendants, individually prescribed devices, readers for personal use or study, or other devices or services of a personal nature are not required under this section.

28 CFR § 42.503(f).

       The ADA requires public entities to provide disabled persons with notice of the protections the statute affords them:

> A public entity shall make available to applicants, participants, beneficiaries, and other interested persons information regarding the provisions of this part and its applicability to the services, programs, or

30 - FINDINGS AND RECOMMENDATIONS

activities of the public entity, and make such information available to them *in such manner as the head of the entity finds necessary* to apprise such persons of the protections against discrimination assured them by the Act and this part.

28 CFR § 35.106 (emphasis added).

The DOJ has provided further guidance on this regulation in *The Americans with Disabilities Act: Title II Technical Assistance Manual* ("Manual") published by the agency to interpret its regulations.[11]  Section II-8.4000 of the Manual specifically comments on the notice requirement:

> *What methods can be used to provide this information?* Methods include the publication of information in handbooks, manuals, and pamphlets that are distributed to the public to describe a public entity's programs and activities; the display of informative posters in service centers and other public places; or the broadcast of information by television or radio. In providing the notice, a public entity must comply with the title II requirements for effective communication, including alternate formats, as appropriate. (emphasis in original).

Methods utilized in communicating this information must comply with the ADA's requirements for effective communication.  29 CFR Pt. 35, App. A., Subpt. A, § 35.106.

The effective communication requirements mandate that public entities "take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with other."  28 CFR § 35.160(a).  Therefore, "[a] public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in, and enjoy the benefits of, a service, program, or activity conducted by a public entity."  28 CFR § 35.160(b)(1).  When

---

[11]  Because it provides the DOJ's interpretation of its own regulations, the Manual "must . . . be given substantial deference and will be disregarded only if 'plainly erroneous or inconsistent with the regulation.'"  *Bay Area Addiction Research and Treatment*, 17 F3d at 732 n11, quoting *Thomas Jefferson Univ. v. Shalala*, 512 US 504, 512 (1994).  Neither party contends that the Manual's applicable provisions in this case are erroneous or inconsistent with the regulations.

"determining what type of auxiliary aid and service is necessary, a public entity shall give

*primary consideration* to the requests of the individual with disabilities.  28 CFR § 35.160 (b)(2)

(emphasis added).  "Auxiliary aids and services" for individuals with hearing impairments may

include:

> Qualified interpreters, notetakers, transcription services, written materials,
> telephone handset amplifiers, assistive listening devices, assistive listening
> systems, telephones compatible with hearing aids, closed caption decoders,
> open and closed captioning, telecommunications devices for deaf persons
> (TDD's), videotext displays, or other effective methods of making aurally
> delivered materials available to individuals with hearing impairments[.]

28 CFR § 35.104(1).

The DOJ's commentary on these regulations states that a "public entity must provide an

opportunity for individuals with disabilities to request the auxiliary aids and services of their

choice," and that "[t]he public entity shall honor the choice unless it can demonstrate that another

effective means of communication exists or that use of the means chosen" would result in a

"fundamental alteration in the nature of a service, program, or activity or in undue financial and

administrative burdens."  28 CFR Pt. 35, App. A, Subpt. E, § 35.160; 28 CFR § 35.164.

The commentary discusses the propriety of certain auxiliary aids quite specifically.  For

example, it instructs that

> [a]lthough in some circumstances a notepad and written materials may be
> sufficient to permit effective communication, in other circumstances they
> may not be sufficient. For example, a qualified interpreter may be
> necessary when the information being communicated is complex, or is
> exchanged for a lengthy period of time. Generally, factors to be considered
> in determining whether an interpreter is required include the context in
> which the communication is taking place, the number of people involved,
> and the importance of the communication.

28 CFR Pt. 35, App. A, Subpt. E, § 35.160.

32 - FINDINGS AND RECOMMENDATIONS

The Manual further explains:

> When an auxiliary aid or service is required, the public entity must provide an opportunity for individuals with disabilities to request the auxiliary aids and services of their choice and must give primary consideration to the choice expressed by the individual. "Primary consideration" means that the public entity must honor the choice, unless it can demonstrate that another equally effective means of communication is available, or that use of the means chosen would result in a fundamental alteration in the service, program, or activity or in undue financial and administrative burdens.
>
> It is important to consult with the individual to determine the most appropriate auxiliary aid or service, because the individual with a disability is most familiar with his or her disability and is in the best position to determine what type of aid or service will be effective. Some individuals who were deaf at birth or who lost their hearing before acquiring language, for example, use sign language as their primary form of communication and may be uncomfortable or not proficient with written English, making use of a notepad an ineffective means of communication.

Manual, § II-7.1100.

Marion County has adopted policies for the MCCF to follow that seek to implement some of the requirements of these regulations. One such policy dictates that:

> D.    [a]uxiliary aids and/or services will be provided when appropriate to ensure adequate communication for persons with hearing . . . disabilities. Auxiliary aids and services may include:
>     1.    Qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments.

Marion County Sheriff's Office, General Order 72.6.2, p. 3 (April 2002) (Steinman Aff., Ex. 5, p. 2).

Additionally, Marion County's policies provide that:

> If the inmate does not understand or speak English, his/her admission will be delayed until the pod deputy can recruit the services of someone to read the rules and regulations to the inmate in his/her language. Arrangements

     will also be made to ensure continued communication with the inmate
     while he/she is in custody.

Marion County Sheriff's Office, General Order 72.8.7, p. 3 (Steinman Aff., Ex. 21, p. 2).

   **C.**  <u>**Denial of Benefits of Services, Programs or Activities**</u>

    Pierce first argues that Marion County excluded him and denied him participation in its

services, programs and activities provided by the MCCF by failing to: (1) provide him with the

notice required by the ADA of reasonable accommodations; (2) ensure that their communication

with him was as effective as their communication with a non-hearing-impaired person, and

(3) provide an ASL interpreter at his release, despite a request to do so. The programs and

services at issue include the booking, intake and classification procedures, access to medical care,

disciplinary action and discharge procedures. Courts have held that similar types of prison

"services" are included in Title II's protections. *See Duffy v. Riveland*, 98 F3d 447 (9th Cir 1996)

(classification and disciplinary proceedings); *Randolph v. Rogers*, 170 F3d 850 (8th Cir 1999)

(reception, classification and disciplinary proceedings and medical care); *Clarkson v. Coughlin*,

898 F Supp 1569 (SDNY 1995) (same). According to Pierce, MCCF clearly violated the

statutory and regulatory mandates of the ADA, thereby denying him access to these programs and

services, and it acted intentionally.

    **1.**  <u>**Lack of Notice**</u>

    First, Pierce claims that Marion County violated the ADA by not informing him of his

rights under the ADA, including the availability of a reasonable accommodation. Marion County

concedes that Pierce was not informed that an ASL interpreter could be provided during his

incarceration, but argues that Pierce had a duty to engage in an interactive process and advise

MCCF staff of his need for an ASL interpreter.  Marion County contends that the ADA does not

require any particular form of notice to be employed and, in particular, does not require a public

entity to ask disabled individuals what sort of accommodation they may need.  It points to

Section II-8.4000 of the Manual which provides that "[a] public entity shall provide such

information as the head of the public entity determines to be necessary to apprise individuals of

title II's prohibitions against discrimination."  Exercising that discretion, it argues that the Marion

County Sheriff elected to notify inmates of accommodations available at MCCF through

observing and speaking to individuals about their needs during incarceration, including, but

limited to, the intake process.

    This argument is not supported by the ADA.  Although the ADA contemplates the

exercise of discretion in choosing how to comply with the notice requirements, this discretion

does not extend to providing no notice.  To communicate the ADA's requirements, Marion

County does not publish information through "the publication of information in handbooks,

manuals or pamphlets," "display of informative posters," or "broadcast of information by

televison or radio," as required in Section II-8.4000 of the Manual.  Instead, Marion County relies

solely on information received through an interactive process to determine whether the disabled

individual is entitled to additional accommodations under the ADA.  Although a public entity can

use "alternate formats, as appropriate" (*id*), to provide information concerning the ADA's

requirements, nothing in the Manual contemplates the lack of any format whatsoever.

    If a public entity decides what accommodation a disabled individual needs without first

explaining the aids and services available and consulting with the individual, then it may

erroneously select an ineffective means of communication.  The entire ADA regulatory scheme is

premised on the disabled individual being given accommodation choices which a public entity must honor, not on the public entity dictating the form of accommodation to the disabled individual. Marion County cannot comply with the ADA by making a unilateral assessment of an individual's needs for accommodation. As Marion County points out, based on his prior incarceration, Pierce knew he could request an ASL interpreter and had an opportunity to do so by writing a note to MCCF staff. However, the ADA requires Marion County to first advise Pierce that he has the right to make that request. The ADA places the burden of notice squarely on the public entity which the public entity cannot shift to the disabled individual.

The facts here are similar to *Clarkson,* 898 F Supp 1019, involving a class action by deaf and hearing-impaired inmates in custody of the New York Department of Corrections seeking declaratory and injunctive relief against defendants for failing to accommodate their hearing impairments in violation of the ADA, Rehabilitation Act, due process rights, and the Eighth Amendment. Defendants failed to provide notice of rights to accommodations and available assistance with disabled inmates:

> As a public entity, DOCS is obligated by the ADA to make available to class members information regarding both the protections against discrimination provided by the statute and the existence and location of accessible services, activities and facilities. . . . Defendants concede that they have posted no signs and have distributed no information in compliance with [ADA] requirements. Defendants have distributed an ADA manual to DOCS staff, but it does not provide information to class members about the accommodations that are available to them nor does it contain procedures for DOCS employees' handling of inmate requests for accommodation.

*Id* at 1044 (internal citations omitted).

36 - FINDINGS AND RECOMMENDATIONS

In addition, as here, defendants failed to consult with disabled inmates about, or take any action in response to requests from inmates for, available auxiliary aids and services:

> As a public entity DOCS must provide disabled inmates with an opportunity to request the auxiliary aids and services of their choice. No class member ever had the benefit of any direct discussion with DOCS staff about their own need for interpreters or auxiliary aids and devices. DOCS has no procedures in place by which to evaluate inmate requests for reasonable accommodation.

*Id* (internal citation omitted).

As a result, the court granted summary judgment to plaintiffs for violation of the ADA's notice and consultation requirements. It also granted summary judgment for violations of both § 504 of the Rehabilitation Act and the ADA based on defendants' failure to provide interpretive services for various aspects of reception and classification.

Here, as in *Clarkson*, the MCCF staff did not notify or consult with Pierce about the availability of an ASL interpreter. In fact, despite Marion County's General Order 72.6.2, some staff were unaware of the availability of an ASL interpreter for deaf inmates. Young Depo., p. 26; Dizotell Depo., pp. 18-19; Poston Depo., p. 19; Herring Depo., p. 47.

From the forgoing, it is apparent that the MCCF violated Title II of the ADA and applicable regulations in failing to provide proper notice to Pierce of his rights pursuant to, and of the availability of accommodations under, the ADA as required by it implementing regulations. However, this court has found no authority stating that a violation of a DOJ regulation constitutes a *per se* case of discrimination against a qualified individual with a disability.[12] In *Clarkson*, the

---

[12] *See, e.g., Californians for Disability Rights, Inc. v. California Dept. of Transp.*, 249 FRD 334, 341-42 (ND Cal 2008) (holding that there is no private right of action to enforce Title II's self-evaluation (28 CFR § 35.105(a)) and transition plan (28 USC § 35.150(d)) regulations.); *Ability Center of Greater Toledo v. City of Sandusky*, 385 F3d 901 (6th Cir 2004) (same); *Iverson v. City of Boston*, 452 F3d 94 (1st Cir 2006) (same), *but see Chaffin v. Kansas State Fair Bd.*, 348 F3d 850 (10th
(continued...)

discrimination against the inmates was systemic, extending to nearly all areas of prison life and manifestly resulting in disparate treatment of hearing impaired inmates throughout their incarceration. In view of such systemic violations, *Clarkson* issued broad declaratory and injunctive relief without discussing whether each specific violation of the ADA's implementing regulations justified a finding of discrimination.

To prevail, Pierce must still show the failure to notify him of his rights under the ADA, or consult with him about available accommodations or auxiliary services, in some way denied him the benefits of a program, service or activity or otherwise discriminated against him. Marion County contends that Pierce was treated the same as any prisoner and that no amount of notice would have changed this. It points to the fact that Pierce ultimately received all of his medications and his placement in Administrative Segregation was due to his violent behavior prior to incarceration. Furthermore, his discipline was imposed because he pounded on his cell door in anger so hard that the deputies feared he would injure himself. Pierce counters that had he been notified of his rights, he would have requested an interpreter who could have aided him in filling out the intake forms, receiving appropriate medical care, and avoiding an unwarranted classification or unnecessary discipline. Whether Pierce was denied meaningful access to, or intentionally discriminated against because of, Marion County's failure to provide him the notice he was due under the ADA, are questions of fact which preclude summary judgment.

///

///

_____

[12](...continued)
Cir 2003).

2.    **Lack of Effective Communication**

Second, Pierce contends that because the ADA requires a public entity to take appropriate steps to ensure effective communication, Marion County had to provide an ASL interpreter for the intake and classification process of his incarceration.  Pierce claims that this failure caused him to be given inadequate medical treatment due to his inability to communicate his medical needs and fill out medical forms properly; placed in Administrative Segregation due to his lack of knowledge of prison rules and methods for challenging his placement; and improperly placed in a restraint chair on two occasions.

Whether Pierce received effective communication at any stage of his incarceration is a question of fact.  With respect to both intake and classification, the MCCF staff concluded that they effectively communicated with Pierce through hand gestures and written notes.  Pierce disagrees, claiming that the mere attempt to communicate, and self-serving determination that communications are effective, does not establish that Marion County took appropriate steps to ensure that the communication was as effective as with a non-disabled person.

Had MCCF staff communicated with Pierce through an ASL interpreter, Pierce would have had no difficulty understanding what was happening to him throughout the intake and classification process.  Instead, their choice to rely on their own assessment of whether Pierce understood the various forms and questions supports Pierce's claim that they failed to comply with their own policy and with the ADA.  But the evidence also shows that Pierce never requested an ASL interpreter during this process or indicated that he was confused or did not understand, despite the fact that he repeatedly communicated with them through notes.  Given his limited English and reading comprehension, Pierce may not have fully understood complicated questions

or documents.  And by nodding his head, he may at times not have been indicating agreement, but simply acknowledging an attempt to communicate.  However, he can respond with gestures to simple written questions and can write questions to indicate his inability to understand.

In fact, Pierce either completed or assisted in completing the Intake Medical Screening Form.  He does not contend that the MCCF staff received wrong medical information, only that the information was incomplete in some respects.  For his physical injury, he received medical attention and, after signing a release, timely received his other medications.  Even though one nurse made a mistake in ASL when communicating with Pierce, Pierce agrees that on the second day, he communicated effectively with the doctor without an ASL interpreter.  Pierce Depo. Vol. I, pp. 84-85.

Aside from the alleged deficiencies in MCCF's intake, classification and orientation, Pierce also claims that MCCF failed to provide effective communication throughout his stay in the MCCF. First, he argues that he was never informed of why he was placed in Administrative Segregation or of how he could challenge this placement.  Marion County counters that Pierce's placement would not have been changed by any effective communication since it was due to his violent assault on Officer Zaitz.  Second, Pierce also claims that his two disciplinary restraints were caused by his requests for the phone and a blanket which he felt were being improperly ignored.  However, Poston states that she wrote a note to Pierce explaining why he would not be allowed to use the phone due to his Administrative Segregation.  Instead of writing a note back with questions, he pounded on the door because he was mad and frustrated and as a result was placed in the restraint chair until he calmed down.  With respect to a blanket, he does not explain why the first night he failed to sign that request to nurse Johnson who understood ASL.

These factual disputes preclude summary judgment on the issue of whether he was denied effective communication under the ADA throughout his stay in the MCCF. *See Randolph v. Rogers*, 170 F3d 850, 859 (8th Cir 1999) (reversing district court's grant of summary judgment to plaintiff because questions of whether a sign language interpreter was a reasonable accommodation or imposed an undue burden on defendants were questions of fact).

### 3.     No ASL Interpretator During Release

Finally, Pierce seeks summary judgment based on Marion County's failure to comply with the request by Pierce's aunt for an ASL interpreter on the day of his release.  It is undisputed that on December 28, 2005, the day of his release, his aunt specifically requested an ASL interpreter during the release process later that day and was told that one would be present.  Yet none was provided.  As a result, Pierce claims that he did not understand the terms, conditions and limitations of his release from jail until explained by his aunt in ASL.

Marion County does not claim that it would have been an undue burden to comply with that request and offers no explanation for its lack of response to the request.  Instead, it argues that this is simply another disputed issue as to whether Pierce was provided effective communication.

Once a request for an auxiliary service was made, Marion County was obligated to give it "primary consideration" unless it can demonstrate it "would result in a fundamental alteration in the nature of a service, program, or activity or in undue financial and administrative burdens."  28 CFR §§ 35.160 and 35.164.  No evidence has been submitted to support any such demonstration.

However, as discussed above, a discrimination claim cannot be premised solely on a violation of the ADA's implementing regulations.  In addition, Pierce must prove that MCCF's failure to provide a qualified interpreter during the release process denied him the benefit of a

program, service or activity or otherwise discriminated against him.  While MCCF did not provide

a qualified interpreter, it is a question of fact whether Pierce is able to communicate effectively

through notes and reading.  The conditions of his release were ultimately explained to him by his

aunt when she arrived, and there is no evidence in the record that he missed any court dates,

violated the terms of his release, or suffered any other adverse consequences as a result of MCCF's

failure.  Therefore, Pierce's motion for summary judgment on this basis should be denied.  *See*

*Bonner v. Lewis*, 857 F2d 559, 563-64 (9th Cir 1988) (denying summary judgment where a plaintiff

alleged that a "prison official's refusal to provide qualified interpreter services impermissibly

discriminated against the plaintiff" because if the plaintiff was able to effectively communicate

without it, no discrimination occurred.)

     **D.**    **Discrimination**

     In addition to his alleged exclusion from participation in and denial of benefits of MCCF's

programs, Pierce also claims that Marion Count discriminated against him on the basis of his

disability by truncating or not following the regular intake procedures and by placing him in the

restraint chair.  This, he alleges, was different treatment than given to non-disabled inmates.

     With respect to the intake process, the deputy normally asks questions of the inmate and

completes the form based on the inmate's responses and follow-up questions.  Instead, Pierce states

that he was given the intake form to complete, was very confused and failed to adequately indicate

his mental health conditions.  To the contrary, Deputy DiNardo stated that he completed the form.

Due to Pierce's deafness, he either obtained the necessary information by communicating with

Pierce by note or stood next to him and turned the form so that both of them could see it and ask

him to read the questions.  It is not clear whether the sole reference to depression on the intake form

failed to properly identify the extent of Pierce's mental health problems and caused later problems during his incarceration.  Thus, a factual dispute exists as to whether the intake process was truncated in a way that impacted Pierce's subsequent treatment.

Pierce also contends that MCCF staff discriminated against him by not following standard procedure when placing him in the restraint chair.  According to routine procedures, the pod deputy first attempts to communicate with the inmate to determine the nature of the problem and tries to resolve the issues through communication.  Dezotell Depo., p. 156.  When inmates are found to be disruptive, one alternative is to move the inmate to D4, the segregation unit.  Poston Depo., pp. 45-47.  Pierce argues that neither process was followed in his case because he was placed in a restraint chair without first attempting to communicate with him.  To the contrary, however, Poston testified that she did try to first communicate with Pierce by writing notes.  Poston Depo., pp. 23-27.  The deputies later placed Pierce in the restraint chair due to a fear that he would injure himself.  *Id* at 23-24; Herring Depo., pp. 57-58.  Furthermore, Pierce was already in Administrative Segregation for his violent assault on Officer Zaitz.

Finally, Pierce claims that placing him in a restraint chair on two occasions constituted discrimination based on his disability.  He concedes that a non-disabled inmate also would be placed in the restraint chair for disruptive behavior, but argues that his disruptive behavior was a product of his mental illness and frustration over his inability to communicate due to the lack of an ASL interpreter.  As a result, he claims that he was punished for his disability, just as the plaintiff in *Gambini v. Total Renal Care, Inc.*, 486 F3d 1087, 1095 (9th Cir 2007), was fired because of her disability.

As Marion County points out, *Gambini* was an employment discrimination case under Washington law dealing with a wrongful termination claim and thus is distinguishable. Furthermore, a dispute exists as to the extent of Pierce's mental illness and whether MCCF staff failed to properly identify his mental health problems. Pierce reports different mental health diagnoses. At his deposition, he stated that he was "bipolar" and had "depression, schizophrenia, mania, and ADHD." Pierce Depo., Vol. I, p. 29. However, he only reported "depression and ADHD" to Dr. Rexin. Also, Marion County has not admitted that Pierce has any mental disabilities that qualify for protection under the ADA. Thus, whether Pierce was punished for his mental illness rests on disputed facts.

Pierce also claims that because he is deaf, the restraint chair was equivalent to placing a gag in his mouth. Because his hands were strapped to the chair, he could not use ASL or write notes to request water, a bathroom break, or an explanation of his treatment. Instead, he could only attract attention by making eye contact or some kind of noise. If he did attract attention, then he could respond appropriately to simple written questions by nodding his head "yes" or "no."

The record is devoid of evidence that if a non-disabled individual verbally communicated those same needs, MCCF staff would satisfied those needs. Even though Pierce could not communicate as easily as a hearing person in the restraint chair, perhaps it would have made no difference. Although Pierce was not offered fluids or bathroom breaks, he has not shown MCCF staff would offer or give fluids or bathroom breaks to a hearing person while in the restraint chair in a manner differently than was provided to him.

This portion of the record is the most troubling to this court. When Pierce was strapped in the chair he was unable to communicate and alleges he did not understand why he was in the chair,

what he needed to do to get out, and was never offered food or drink.  On the other hand, the

deputies allege that when they attempted to give him the jail manual explaining the use of the chair,

Pierce flipped it off, refused to cooperate, and the second time he was placed in the chair, he

behaved so violently that he cause the chair to bounce around.  Therefore, factual disputes exists as

to whether standard procedure was followed with respect to placing Pierce in the restraint chair.

Absent further evidence to show the necessary difference in treatment, summary judgment should

be denied as to this portion of Pierce's disability claim.

## RECOMMENDATIONS

Defendants' Motion for Summary Judgment (docket #34) should be DENIED and plaintiff's

Motion for Partial Summary Judgment against Marion County (docket #40) should also be

DENIED.

## SCHEDULING ORDER

Objections to these Findings and Recommendations, if any, are due **July 25, 2008.**  If no

objections are filed, then the Findings and Recommendations will be referred to a district judge and

go under advisement on that date.

If objections are filed, then a response is due within 10 days after being served with a copy

of the objections.  When the response is due or filed, whichever date is earlier, the Findings and

Recommendations will be referred to a district judge and go under advisement.

DATED this 8th day of July, 2008.


/s Janice M. Stewart
Janice M. Stewart
United States Magistrate Judge

45 - FINDINGS AND RECOMMENDATIONS